[Cite as *State v. Ostermeyer*, 2021-Ohio-3781.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-01-002 |
| - vs - | : | O P I N I O N<br>10/25/2021 |
| | : | |
| DEVIN OSTERMEYER, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. CRI20200171

Jess C. Weade, Fayette County Prosecuting Attorney, for appellee.

Steven H. Eckstein, for appellant.

**HENDRICKSON, J.**

{¶ 1} Appellant, Devin Ostermeyer, appeals his conviction in the Fayette County Court of Common Pleas for endangering children.

{¶ 2} D.O., born on January 8, 2020, was the first child of Debra Smith-Merz and appellant. At the time, the couple resided together in Newport, Ohio, along with Smith-Merz's father, stepmother, and five of her nieces and nephews. Between February and March 2020, the couple moved with D.O. to Washington Court House, where they lived with

one of their friends and his brother.

{¶ 3} On March 12, 2020, Smith-Merz and appellant got into a "heated" argument that ultimately resulted in the police being called. During the course of the altercation, appellant grabbed D.O. around the infant's mid-section and repeatedly attempted to pull him out of Smith-Merz's arms. This caused D.O. to cry loudly which continued for several minutes after everything subsided. When the officers arrived, they assisted Smith-Merz in leaving the residence. The responding officer reported that he heard D.O. "whimper" as he was carried away.

{¶ 4} On the evening of May 5, 2020, appellant's mother was watching D.O. When the couple picked the infant up that evening, neither parent observed any problems with D.O.'s arm. Around 4:30 a.m. the following morning, appellant observed that the infant was heavily favoring his left arm and would not move his right arm or would whimper if it was moved. On May 8, Smith-Merz and appellant took D.O. to the emergency room at the Fayette County Memorial Hospital. Smith-Merz and appellant were the child's sole caregivers for the two days prior to the emergency room visit. When they arrived at the hospital, Smith-Merz took D.O. into the hospital alone, while appellant waited in the parking lot due to COVID-19 distancing protocol.

{¶ 5} D.O. was admitted to the emergency room and as part of the initial assessment, an x-ray was performed on the infant's right arm. The x-ray revealed a fracture of the humerus bone. Dr. Leanna Withrow, the attending physician, testified at trial that on seeing such a fracture in a child unable to move independently, she immediately was suspect of abuse. She then spoke to Smith-Merz to try and determine what caused the fracture. After speaking with Smith-Merz, Dr. Withrow performed a comprehensive assessment on D.O., including a full skeletal x-ray. While reviewing D.O.'s x-rays, Dr. Withrow observed multiple rib fractures as well as a wrist fracture. Child Protective Services

("CPS") was then called and took custody of D.O. A representative from CPS spoke with Smith-Merz at the hospital, told her the extent of D.O.'s injuries, and told her that D.O. was being transferred to Nationwide Children's Hospital ("Nationwide") in Columbus for additional testing and care.

{¶ 6} Later that afternoon, it was discovered at Nationwide that D.O. had eleven rib fractures, both anterior and posterior and on either side of his spine, as well as a spiral fracture to his right humerus and a fracture to his left tibia. Tishia Gunton, a medical social worker at Nationwide, talked to Smith-Merz by telephone regarding possible causes of D.O.'s injuries. Smith-Merz related the possibility that the injuries were caused by appellant tripping and falling while holding D.O., with the infant landing on appellant's chest. After being informed by CPS as to the extent of D.O.'s injuries, Smith-Merz and appellant personally spoke with everyone who had watched D.O. to try to determine the source of the injuries. This included Smith-Merz's father and stepmother, her mother and stepfather, her aunt, and appellant's mother. D.O.'s parents ruled out everyone they spoke with as having been the source of his injuries.

{¶ 7} On May 11, both Detective John Warnecke and Detective Thomas Queen of the Washington Court House Police Department individually questioned appellant. During his interview with Detective Warnecke, appellant repeatedly acknowledged that he "could have been too rough on" D.O., "especially whenever we had the [March 12] altercation between me and Debra," and that at other times he could have "used too much force." Appellant stated that during the timeframe when D.O. allegedly sustained the spiral fracture, "As far as I know, I was the only one who had contact with [D.O.]," and that "no one else has had contact with [D.O.]" during that time. Regarding D.O.'s spiral fracture, appellant told Detective Warnecke that "I honestly thought I broke his arm whenever I picked him up. I honestly went over to my mom's house crying because I thought it was something I did."

Finally, appellant stated "I don't know how or if I did this, but I was the only one in contact with him."

{¶ 8} On July 10, 2020, a Fayette County Grand Jury indicted appellant for one count of felonious assault and one count of endangering children. The matter proceeded to a jury trial on January 14, 2021.

{¶ 9} The State called four doctors to testify regarding D.O.'s injuries. The first doctor was Dr. Brent Adler, a pediatric radiologist at Nationwide. He testified that he estimated that D.O.'s rib fractures were more than a week old when the infant arrived at Nationwide and could have been up to three months old, but that the spiral fracture was "recent." He testified in detail as to the amount of force necessary to produce a spiral fracture, the significant force of squeezing required to produce posterior rib fractures, and his opinion that a tibial fracture could only be the result of shaking or pulling. He also noted that if the rib fractures had been accidental, there would have been no more than two fractures, as opposed to the eleven present in D.O. Finally, he noted that there were no signs that D.O. had osteomalacia ("soft bones") or osteogenesis imperfecta ("brittle bone disease"), the latter of which appellant testified ran in both sides of D.O.'s family. The other three doctors concurred in their testimony that it was highly unlikely that D.O. had brittle bone disease and that the injuries were obviously "nonaccidental" in nature.

{¶ 10} Taryn Fraley, a Fayette County Children's Services caseworker, testified that the last medical record for D.O. prior to his May 8 admission to the emergency room was from his two month "well check" visit at ABC Pediatrics of Ohio in Washington Court House. The examination was comprehensive and the doctor's report concluded that there were "no abnormal findings." This examination occurred prior to the domestic altercation where appellant attempted to pull D.O. away from Smith-Merz.

{¶ 11} Smith-Merz testified as to several prior dangerous incidents involving the

- 4 -

manner in which appellant engaged in with D.O., including picking him up by his arms, tripping and falling while carrying him, and grabbing and pulling his torso during an argument with Smith-Merz while she was holding him. She previously told officers that she was concerned that appellant was being too rough with D.O. and noted that appellant had once thrown D.O. onto the bed. At trial however, Smith-Merz testified that she had fabricated those statements in making an attempt to regain custody of D.O. from CPS.

{¶ 12} The jury returned its verdict after close of business on Friday, January 15, 2020. Appellant was found not guilty of felonious assault, but guilty of endangering children in violation of R.C. 2912.22(A). The jurors were dismissed, and the case was set for sentencing on the following Tuesday.[1] After everyone had been dismissed, the court discovered that it had accidentally dismissed two original jurors and seated the two alternate jurors in their place. At the sentencing hearing several days later, the court shared its discovery with counsel, discussed the matter off the record, then called all twelve original jurors, along with the two alternate jurors, back into court on Thursday, two days later. One of the original twelve selected jurors was unable to attend due to COVID-19 precautions, so the court seated the remaining eleven originally selected jurors plus one of the two alternate jurors.

{¶ 13} The state requested the court either accept the jury's findings or alternatively, declare a mistrial. Appellant did not request a mistrial but noted concerns about double jeopardy if the felonious assault charge on which appellant was acquitted was resubmitted for deliberation. The court overruled the state's motion for a mistrial and overruled its subsequent motion that both counts be resubmitted to the jury. The court noted its intention to preserve all issues for appellate review.

---

1. The court was not open on the following Monday due to a recognized holiday.

{¶ 14} The court then conducted a new voir dire, instructing the twelve seated jurors "to start your deliberation over again or 'anew' as the statute says." It gave the jurors access to their notes and all exhibits. The court instructed the jurors to elect a foreperson again and to "re-deliberate anew with two members that were not part of your deliberations" and to put the prior verdict "out of your mind and discuss the case with all 12 jurors[2]."

{¶ 15} The court asked the two selected jurors who had been mistakenly excluded from the prior deliberation whether they had followed its instructions not to discuss the matter with anyone or tell anyone how they would have voted, and both affirmed they had. It then asked whether there was any reason they could not be fair and impartial to which both replied "no". The trial court also asked whether either of them had contact with the attorneys or anyone else to get information about the case, to which both again responded "no." Both attorneys were given an opportunity to question the jurors further and both declined. The court then instructed the jurors not to presume the correctness or incorrectness of the preceding verdict and sent the panel to deliberate on the single charge of endangering children.[3]

{¶ 16} The re-seated jury returned its verdict, again finding appellant guilty of endangering children in violation of R.C. 2919.22(A). Appellant was sentenced to 36 months in prison. Appellant now appeals his conviction, raising three assignments of error. We will address the assignments of error out of order.

{¶ 17} Assignment of Error No. 3:

{¶ 18} JUROR MISCONDUCT DENIED DEFENDANT-APPELLANT DUE

---

2. Again, due to COVID-19 precautions, one of the original jurors was replaced by an alternate juror who had herself participated in the first deliberation. Thus, the court should have instructed the panel to "re-deliberate anew with *one* member who was not part of" the earlier deliberations.

3. The single charge of felonious assault was not resubmitted to the jury due to concerns regarding double jeopardy issues.

PROCESS IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTIONS 10, 14, AND 16 OF THE OHIO CONSTITUTION.

{¶ 19} In his third assignment of error, appellant contends that by permitting the two alternate jurors to be impaneled, the trial court denied him due process.

{¶ 20} In criminal trials, the accused has the constitutional right to be tried before a fair and impartial jury. *State v. Shaner*, 12th Dist. Preble No. CA2018-09-013, 2019-Ohio-2867, ¶ 29. This means that "a jury must decide a case solely on the evidence before it, and not reach its verdict based upon influences outside the courtroom." *Id.*, quoting *State v. Villarreal*, 12th Dist. Butler No. CA2004-02-035, 2005-Ohio-1924, ¶ 37. A deviation from this standard constitutes juror misconduct. *Shaner* at ¶ 29. The determination of juror misconduct requires a two-part analysis: first, the court must determine if juror misconduct occurred; and second, the court must determine whether the misconduct materially prejudiced the defendant's substantial rights. *Id.*

{¶ 21} Alternate jurors are "drawn in the same manner, have the same qualifications, [are] subject to the same examination and challenges, take the same oath, and have the same functions, powers, facilities, and privileges as the regular jurors." Crim.R. 24(G)(1). However, the Supreme Court of Ohio "has consistently stated that allowing alternate jurors to be present during jury deliberations is error." *State v. Downour,* 126 Ohio St.3d 508, 2010-Ohio-4503, ¶ 7, citing *State v. Murphy,* 91 Ohio St.3d 516, 531 (2001) ("It is generally regarded as erroneous to permit alternates to sit in on jury deliberations"). An alternate is part of the "trial jury" if properly substituted for a regular juror, but if the alternates are not substituted, then at least as a technical matter, they are not part of the jury. *Murphy* at 532. Consequently, communication during deliberations between a juror and an alternate juror who is not properly substituted constitutes an improper outside influence.

{¶ 22} "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror." *State v. Phillips*, 74 Ohio St.3d 72, 88, 1995-Ohio-171. In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror." *Id.* at 89. "A trial court may rely upon a juror's testimony as a basis for finding that her impartiality was not affected." *State v. Herring*, 94 Ohio St.3d 246, 259, 2002-Ohio-796; *see also State v. Wright*, 12th Dist. Fayette No. CA2017-10-021, 2018-Ohio-1982, ¶ 40. The reviewing court "should assume, unless an appellant can demonstrate otherwise, that jurors follow their oaths." *Villarreal* at ¶ 43, citing *State v. Durr*, 58 Ohio St.3d 86, 91 (1991).

{¶ 23} Reversible error occurs where "an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant and either (1) the state has not shown the error to be harmless, or (2) the trial court has not cured the error." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 137. "If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Crim.R. 24(G)(1). "Generally, a reviewing court must presume that the jury followed the trial court's curative instruction." *State v. DePew*, 38 Ohio St.3d 275, 284 (1988); *see also City of Hamilton v. Kuehne*, 12th Dist. CA 97-10-198, 1998 WL 568697, *3 (Sept. 8, 1998) ("A jury is presumed to follow any curative instruction given by the trial court * * * [and] such specific curative instructions are generally presumed to be effective.").

{¶ 24} In this case, the two alternate jurors were impaneled in place of two of the original seated jurors. This constituted a reversible error. *Gross* at ¶ 137. Communication between the properly impaneled ten jurors and the improperly impaneled two alternates was consequently an improper outside communication. *Murphy* at 532. When the court learned of the improper communication, it informed the parties, recalled the jurors, and held

a hearing to determine whether the jurors' impartiality had been impacted by the presence of the alternates.  All jurors maintained that they were not unduly influenced and that they could remain impartial.  The court properly relied on this testimony before re-impaneling the jury without the alternates.  *Herring* at 259.  The court then specifically instructed the jury to begin its deliberations anew.  *See* Crim.R. 24(G)(1).  The court thus cured the error.  *Gross* at ¶ 137.

{¶ 25} Appellant contends that the mistakenly impaneled alternate juror's input in reaching the jury's verdict on the first panel constituted an outside influence on the *second* panel and therefore juror misconduct.  He asserts, without offering any evidence, that this alleged misconduct prejudiced the result of the second verdict.  It is true that "it is the *presence* of the alternate jurors that shifts the burden to the state to show that any error is harmless."  *Downour* at ¶ 9.  Although the State did not make a formal argument below as to why the error was harmless, there is nothing in the record that the second panel members were influenced or pressured in reaching their verdict by the alternates presence in the first trial.

{¶ 26} Additionally, appellant's contention is unpersuasive because the court's express instructions to the second panel to "begin deliberations anew" cured any outside information imparted by the alternate to the initial panel.  *Kuehne* at *3; *DePew* at 284; *Gross* at ¶ 137.  We presume that the court's curative instruction to begin deliberations anew was effective and was sufficient to ensure appellant's constitutional right to a trial by jury was not violated.  *Kuehne* at *3; *DePew* at 284.  There is also no evidence below that the second panel failed in any way to follow the trial court's curative instructions.[4]

---

4. In addition to the two alternate jurors being mistakenly impaneled during the first trial, it was also mentioned below that two of the jurors talked to the prosecutor after reaching the initial verdict.  Appellant does not challenge the jurors' discussions with the prosecutor in this appeal.

{¶ 27} Appellant's third assignment of error is overruled.

{¶ 28} Assignment of Error No. 1:

{¶ 29} THE TRIAL COURT ERRED IN DENYING DEFENDANT-APPELLANT'S CRIM.R. 29 MOTION FOR ACQUITTAL AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO CONCLUDE THAT GUILT HAD BEEN PROVEN BEYOND A REASONABLE DOUBT IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶ 30} Assignment of Error No. 2:

{¶ 31} THE TRIAL COURT ERRED IN ACCEPTING THE JURY VERDICT OF GUILTY AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO CONCLUDE THAT GUILT HAD BEEN PROVEN BEYOND A REASONABLE DOUBT AND THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF DEFENDANT-APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶ 32} In his first and second assignments of error, appellant argues that the trial court erred by denying his Crim.R. 29 motion for acquittal and that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 33} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." *See also State v. Cooper*, 139 Ohio App.3d 149, 158 (12th Dist. 2000). An appellate court reviews the denial of a Crim.R. 29(A) motion pursuant to the same standard

as that used to review a sufficiency-of-the-evidence claim. *State v. Lee*, 12th Dist. Fayette Nos. CA2020-09-014 and CA2020-09-015, 2021-Ohio-2544, ¶ 15.

{¶ 34} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *Id.* The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Watson*, 12th Dist. Warren No. CA2014-08-110, 2015-Ohio-2321, ¶ 22. In other words, the test for sufficiency requires a determination as to whether the state has met its burden of production at trial. *Lee* at ¶ 15, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 34.

{¶ 35} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Miller*, 12th Dist. Preble No. CA2019-11-010, 2021-Ohio-162, ¶ 13. An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 14.

{¶ 36} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380,

386, 1997-Ohio-52. Nevertheless, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Billingsley*, 12th Dist. Butler No. CA2019-05-075 and CA2019-05-076, 2020-Ohio-2673, ¶ 15.

{¶ 37} R.C. 2919.22(A) states in relevant part that, no parent of a child under eighteen years of age "shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." "Substantial risk" is defined by R.C. 2901.01(A)(8) as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."

{¶ 38} If the violation of duty leads the child to suffer serious physical harm, the crime is a felony of the third degree. R.C. 2919.22(E)(2)(c). "Serious physical harm" is defined as "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e). Thus, this sub-section describes three categories of pain that constitute serious physical harm: "acute pain of such duration as to result in substantial suffering," any degree of "prolonged pain," and any degree of "intractable pain." *State v. Fitzgerald*, 12th Dist. Clermont No. CA2016-06-041, 2017-Ohio-2716, ¶ 21.

{¶ 39} The culpable mental state for endangering children is that of recklessness. *State v. Sigman*, 12th Dist. Fayette No. CA2018-01-002, 2018-Ohio-3850, ¶ 14. R.C. 2901.22(C) defines the culpable mental state of recklessness:

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 40} In both assignments of error, appellant contends that the state failed to prove beyond a reasonable doubt his identity as the perpetrator of the offense. "The state is responsible for providing the jury with sufficient proof in order to convince them, beyond a reasonable doubt, that *every element* of an offense is present." (Emphasis added.) *State v. Craft*, 12th Dist. Butler No. CA2008-01-023, 2009-Ohio-675, ¶ 35. Further, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the accused] is charged." *State v. Nucklos*, 121 Ohio St.3d 332, 2009-Ohio-792, ¶ 6, quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068 (1970). "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime." *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 15.

{¶ 41} Like any fact, the state can prove the identity of the accused by circumstantial or direct evidence. *Id.*; *see also State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, ¶ 112 (circumstantial and direct evidence have the same probative value). Circumstantial evidence is "proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Haley*, 12th Dist. Butler No. CA2012-10-211, 2013-Ohio-4123, ¶ 8. A conviction based on purely circumstantial evidence is no less sound than a conviction based on direct evidence. *Id.*

{¶ 42} The evidence presented at trial all pointed to appellant as the person responsible for D.O.'s injuries. It is true that multiple people watched D.O. during the time period in which the infant's injuries could have occurred. However, appellant himself testified that his mother, who was the last person besides the couple to watch D.O. before the infant was admitted to the hospital, did not cause D.O.'s injuries. He further testified that the couple's roommates did not cause the injuries, and that Smith-Merz did not cause

the injuries. Given the timeframe between D.O.'s two month well check visit, at which he was deemed healthy, and his admission to the emergency room almost two months later, the evidence supports a finding that appellant caused D.O.'s injuries.

{¶ 43} Further, appellant admitted to the police that he was occasionally "too rough" with D.O. and that he "thought he caused the injuries." Finally, of the scenarios proffered by appellant and Smith-Merz to law enforcement, CPS, and medical personnel, the only plausible explanation for the rib fractures was appellant's grabbing of D.O.'s torso during his altercation with Smith-Merz to which police responded. Accordingly, we find that the manifest weight of the evidence supports appellant's convictions for third-degree felony child endangering. Consequently, the state's evidence was also sufficient for the jury to find appellant guilty of the charged offense. *Billingsley*, 2020-Ohio-2673, at ¶ 15. Appellant's first two assignments of error are meritless and are therefore overruled.

{¶ 44} Judgment affirmed.

PIPER, P.J., and BYRNE, J., concur.