[Cite as *State v. Miller*, 2021-Ohio-162.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-11-010 |
| | : | O P I N I O N |
| - vs - | | 1/25/2021 |
| | : | |
| BRIAN J. MILLER, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 19CR12952


Martin P. Votel, Preble County Prosecuting Attorney, Gractia S. Manning, 101 East Main Street, Courthouse, First Floor, Eaton, Ohio 45320, for appellee

Samuel D. Borst, 3247 Camden Road, Eaton, Ohio 45320, for appellant



**PIPER, J.**

{¶1} Appellant, Brian Miller, appeals his convictions in the Preble County Court of Common Pleas for inducing panic with an accompanying one-year firearm specification, and endangering children.

{¶2} A Preble County Sheriff's Office dispatcher received an emergency call from a mother indicating that her daughter, Sara, was being held hostage by her boyfriend, Brian

Miller. Miller and Sara's child were also in Sara's rental home at the time of the incident. The mother reported to the dispatcher that Sara was scared and needed help. The dispatcher then called Sara directly, and Sara indicated that she was not free to leave the house and that Miller was still present as was their daughter. The dispatcher asked Sara if Miller had a firearm and, if so, where it was located. Sara responded that Miller had a firearm "on him."

{¶3} Two Preble County deputies arrived at Sara's house, but no one answered the door when the deputies knocked and announced their presence. The deputies began to walk around the house, and one deputy heard a male voice through a rear bedroom window. The deputy then observed Sara and her daughter exit the house through the back porch.

{¶4} Sara informed the deputy that Miller was inside the house and that he had a firearm. She also told the deputy that Miller was going to do whatever was necessary to avoid going to jail and that Miller said he would come out shooting. A standoff then ensued when Miller refused to exit the house.

{¶5} During the standoff, Sara told police that she and Miller argued and that whenever she tried to leave, Miller stood in the doorway or pushed her down. Sara texted her Mother for help because Miller told Sara that if she called the police, she would be dead before police could arrive. Sara confirmed with police that Miller had a rifle in the house and that she helped him hide so that she could leave the house. She also reiterated that Miller threatened to do whatever was necessary not to go to jail, and that he would come out of the house shooting.

{¶6} The standoff continued for several hours during which time the road near Sara's house was blocked off and traffic was rerouted. Police had neighbors shelter in place until the standoff ended. Deputies attempted to coax Miller out of the house and a

certified hostage negotiator spent several hours trying to convince Miller to come out, but Miller refused to do so.

{¶7} A SWAT team eventually arrived on the scene and made 67 attempts to contact Miller. However, Miller did not leave the house until the SWAT team shot tear gas into the house. Miller left the house through an opening in the attic and was arrested without further incident. After entering the house, officers located a firearm therein with a live round in the chamber.

{¶8} During a subsequent interview with detectives, Miller admitted he always kept the firearm loaded, that he threatened Sara, stood in the doorway blocking Sara's exit, and that he handled the firearm while Sara and their child were in the house. Miller also admitted to telling Sara that she was not leaving the house and that he had made comments in the past about refusing to be arrested peacefully.

{¶9} Miller was ultimately charged by an amended indictment with abduction, inducing panic, domestic violence, and endangering children. Miller pled not guilty and the matter proceeded to a jury trial. Before trial began, Sara recanted her statements and asserted that Miller had not threatened or harmed her or their daughter during the incident. The state filed a motion to call Sara as a court's witness, which the trial court granted.

{¶10} During trial, Sara testified that Miller had not threatened or harmed her or their daughter and that Miller did not prevent her from leaving the house. The jury found Miller guilty of inducing panic with a firearm specification and also guilty of endangering children. However, it acquitted Miller of abduction and domestic violence. Miller filed a motion for a new trial, which the trial court denied. The trial court sentenced Miller to an aggregate sentence of 21 months in prison. Miller now appeals his convictions, raising the following assignments of error. Because the first and second assignments of error are interrelated, we will address them together.

## I. Manifest Weight and Sufficiency of Evidence

{¶11}  Miller argues in his first two assignments of error that his convictions were against the manifest weight of the evidence and were not supported by sufficient evidence.

{¶12}  When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would support a conviction.  *State v. Gross*, 12th Dist. Preble No. CA2018-01-001, 2018-Ohio-4557, ¶ 15.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *State v. Baikov*, 12th Dist. Fayette No. CA2019-11-023, 2020-Ohio-4876, ¶ 13.

{¶13}  A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other."  *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14.  To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶14}  Questions regarding witness credibility and weight of the evidence "are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence."  *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26.  As a result, "the question upon review is whether in resolving conflicts in the evidence, the jury clearly lost

its way and created such a manifest miscarriage of justice that the conviction must be reversed." *State v. Erdmann*, 12th Dist. Clermont Nos. CA2018-06-043 and CA2018-06-044, 2019-Ohio-261, ¶ 23. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶15} Miller was convicted of inducing panic in violation of R.C. 2917.31(A)(3)(c), which prohibits one from causing serious public inconvenience or alarm by committing an offense with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm. If economic harm results from inducing panic and the amount is more than $7,500 but less than $150,000, the charge is a felony of the fourth degree.

{¶16} Miller was also convicted of endangering children in violation of R.C. 2919.22(A), which prohibits a parent of a child under the age of 21 from creating "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

{¶17} After reviewing the record, we find that Miller's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. At trial, the state presented testimony from law enforcement officers that the community suffered serious inconvenience and alarm. Law enforcement officers cordoned off a large area surrounding the house and instructed neighbors not to leave their houses for over eight hours. The road leading to the house was closed and vehicular traffic, including school busses, had to be rerouted to avoid the area.

{¶18} The firearm specification was also supported by evidence that Sara told the police dispatcher that Miller had the firearm "on him" at the time of the offense. Miller further admitted to police that he had control of the firearm both before and after the standoff began,

and the record is undisputed that officers located the loaded firearm after Miller finally left the house.

{¶19} The evidence also established that the rental house incurred damage due to the standoff and the use of tear gas to flush out Miller. This damage exceeded $11,000.[1] Because of Miller's actions that resulted in damage to the house, the landlord was unable to rent the house for several months, incurring thousands of dollars in lost compensation. The county was also forced to expend funds for law enforcement and emergency personnel who responded to the call. The total amount of damage exceeded the necessary $7,500 threshold.

{¶20} While Miller claims that this damage did not occur to the alleged victims, Sara or their daughter, the statute defining economic harm does not require such a limited application. *See State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 35 (noting that R.C. 2917.39 defines economic harm "broadly").

{¶21} According to R.C. 2917.39(E)(1), economic harm means any of the following,

> (a) All direct, incidental, and consequential pecuniary harm suffered by a victim as a result of criminal conduct. "Economic harm" as described in this division includes, but is not limited to, all of the following:
>
>> (i) All wages, salaries, or other compensation lost as a result of the criminal conduct;
>>
>> (ii) The cost of all wages, salaries, or other compensation paid to employees for time those employees are prevented from working as a result of the criminal conduct;
>>
>> (iii) The overhead costs incurred for the time that a business is shut down as a result of the criminal conduct;

---

1. Miller also argues that the landlord received insurance reimbursement for the damage to the rental house so that the total amount of economic harm should be lowered. However, Ohio law differentiates between "economic harm" and "economic loss" as used in the restitution statute. *City of Centerville v. Knab*, 2d Dist. Montgomery No. 28081, 2019-Ohio-1903. Economic harm includes the total damage to the rental house, not just the landlord's financial losses.

(iv) The loss of value to tangible or intangible property that was damaged as a result of the criminal conduct.

(b) All costs incurred by the state or any political subdivision as a result of, or in making any response to, the criminal conduct that constituted the violation of this section or section 2917.32 of the Revised Code, including, but not limited to, all costs so incurred by any law enforcement officers, firefighters, rescue personnel, or emergency medical services personnel of the state or the political subdivision.

{¶22} Thus, the statute provides for economic harm to "a victim" rather than any one specific victim of the underlying criminal act that results in damage to property. As a result of Miller's conduct, the rental house incurred damage, regardless of the fact that it was owned by someone other than Sara or her daughter. *See State v. Juniel*, 2d Dist. Montgomery No. 25629, 2013-Ohio-5459 (including damage caused to a rental apartment when calculating economic harm).

{¶23} The record also demonstrates that Miller's conviction for child endangerment was supported by the manifest weight and sufficiency of evidence. Miller argues that his child was not harmed on the day of the incident and that she was never in substantial risk of harm. We disagree.

{¶24} The state presented evidence that at the time of the incident, the child was present in the house as events began and continued to unfold. These events included methamphetamine possession and use, as well as periods of intense arguing between Sara and Miller.[2] The child was also present when Sara told the dispatcher that Miller had the firearm "on him." When Sara and the child ran from the house, the child was wearing her pajamas, but no coat, on a morning with temperatures in the 40-degree range. The record

---

2. Sara testified that Miller had methamphetamine in the house and that she ingested it before the police arrived to keep the police from finding it. While Sara ultimately recanted her statements that Miller threatened and harmed her, she testified that the two fought that night into morning, and that a physical struggle ensued over her telephone when Miller attempted to take control of it.

is undisputed that Sara held the child as she exited the house upon the police's arrival and the child was subjected to the dangerous circumstances as police began their standoff with an armed Miller.

{¶25} The jury was in the best position to weigh the evidence regarding what risk the circumstances posed the child's health and safety, and we do not find that the jury clearly lost its way or created a manifest miscarriage of justice in finding that Miller's conduct constituted child endangering.

{¶26} After reviewing the record, we find that Miller's convictions were supported by the manifest weight and sufficiency of the evidence. As such, Miller's first two assignments of error are overruled.

## II. Motion for a New Trial

{¶27} Miller argues in his third assignment of error that the trial court erred in denying his motion for a new trial.

{¶28} According to Crim.R. 33, a defendant may be granted a new trial for various causes materially affecting his or her substantial rights. Those causes include,

(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

(3) Accident or surprise which ordinary prudence could not have guarded against;

(4) That the verdict is not sustained by sufficient evidence or is contrary to law. If the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and shall pass sentence on such verdict or finding as modified;

(5) Error of law occurring at the trial;

(6) When new evidence material to the defense is discovered * * *

{¶29} An appellate court may not disturb a trial court's decision denying a motion for a new trial absent an abuse of discretion. *State v. Vore,* 12th Dist. Warren Nos. CA2012-06-049 and CA2012-10-106, 2013-Ohio-1490, ¶ 39. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 170.

{¶30} "The discretionary decision to grant a motion for a new trial is an extraordinary measure which should be used only when the evidence presented weighs heavily in favor of the moving party." *State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, ¶ 53. "The deference shown to the trial court in such matters is premised in large part upon the familiarity of the trial court with the details of the case as a result of having presided over the actual trial." *Id.*

{¶31} Miller filed a motion for a new trial, using each of the grounds provided for in Crim.R. 33.

A. Jury Instructions and Indictment

{¶32} First, Miller argued that a new trial was warranted because the indictment and jury instructions regarding inducing panic were insufficient for not identifying the underlying offense.

{¶33} For jury instructions to be considered reversible error, it must be clear that such instructions constituted prejudicial error to the defendant. *State v. Grimm*, 12th Dist. Clermont No. CA2018-10-071, 2019-Ohio-2961, ¶ 26. Thus, the relevant question is whether the trial court's jury instructions, taken in their entirety, "fairly and correctly state the law applicable to the evidence presented at trial." *State v. Sexton*, 12th Dist. Warren No. CA2018-08-100, 2020-Ohio-153, ¶ 7.

{¶34} Miller did not object to the jury instructions or inform the trial court that the inducing panic section did not list an underlying offense. Even so, the trial court found, and we agree, the jury was instructed on each of the underlying offenses including endangering children, abduction, and domestic violence within the jury instructions. The jury was thus aware of the charges constituting the predicate offenses Miller allegedly committed while inducing panic. Thus, when read as a whole, the instructions fairly and correctly stated the law and what charges were pending against Miller.

{¶35} Miller also alleges that the indictment was insufficient for not listing the underlying offense to support the inducing panic charge. However, challenges to the sufficiency of the indictment are not proper grounds for a new trial and must, instead, be raised before trial. Crim.R. 12(C)(2); *State v. Frazier*, 73 Ohio St.3d 323, 332 (1995). While Miller could have also challenged the indictment on appeal using a plain error standard, he did not raise an assignment of error regarding the indictment and thus failed to challenge that issue on appeal.[3]

{¶36} Even had Miller properly raised such an error on appeal or had he objected at trial, such would not have been a proper basis for a new trial. The record reveals that Miller was charged with crimes that would support predicate offenses for the inducing panic charge. The indictment and jury instructions specifically listed child endangering, abduction, and domestic violence as the other crimes with which Miller was charged. Miller was thus given clear notice of the state's theory of the case and the facts and circumstances that supported the predicate charges. At no point was Miller confused or surprised by the

---

3. Miller's only three assignments of error challenge the manifest weight and sufficiency of the evidence, as well as the trial court's denial of his motion for a new trial. Miller, however, did not raise a specific assignment of error challenging the sufficiency of the indictment as required by the appellate rules. *See* App.R. 12(A)(1)(b). While Miller references arguments raised in his motion for a new trial filed with the trial court, those arguments are not the same as assigning error on appeal as contemplated by the appellate rules. *See also* App.R. 16(A)(7).

fact that child endangering, a crime for which the jury found Miller guilty, was charged by the state and acted as an underlying offense to Miller's inducing panic charge.

## B. Jury Issues

{¶37} Miller also alleged that a new trial was warranted because there was not an alternate juror during his trial. According to Crim.R. 24(G)(1), a trial court "may," but is not required to impanel alternate jurors. "Despite the advantage of having alternate jurors available to serve in case one or more of the regular jurors becomes unable to perform their duties, alternate jurors are not constitutionally required." *State v. Wright*, 2d Dist. Clark No. 99CA0011, 2000 Ohio App. LEXIS 2239, at *22 (May 26, 2000).

{¶38} Before trial, a jury was seated after the parties each exercised their four peremptory challenges and the proposed alternate juror was excused for cause. However, at no time did Miller move for a mistrial or object because an alternate juror had not been designated, and at no time did Miller assert during trial that disqualification of a sitting juror was necessary. Instead, the matter proceeded from the presentation of evidence to jury deliberations without the need to seat an alternate juror. Thus, the absence of an alternate juror had no effect on the trial or the jury's verdict.

{¶39} Miller also alleges juror misconduct based on his assertion that a juror fell asleep during the trial and that a juror asked a question about the pending charges. In criminal trials, the accused has the constitutional right to be tried before a fair and impartial jury. *State v. Villarreal*, 12th Dist. Butler No. CA2004-02-035, 2005-Ohio-1924, ¶ 37. A deviation from this standard constitutes juror misconduct. *State v. Shaner*, 12th Dist. Preble No. CA2018-09-013, 2019-Ohio-2867, ¶ 29.

{¶40} The determination of juror misconduct requires a two-part analysis. *Id.* First, the court must determine if juror misconduct occurred. *Id.* Second, the court must determine whether the misconduct materially prejudiced the defendant's substantial rights.

*Id.* Juror misconduct must be affirmatively demonstrated, not presumed. *State v. Kent*, 12th Dist. Warren Nos. CA98-08-094, CA98-10-140 and CA98-12-152, 1999 Ohio App. LEXIS 2667, *16 (June 14, 1999).

{¶41} As noted above, Miller alleged that a juror fell asleep during trial. However, Miller did not raise the issue with the trial court. The suggestion that a juror's eyes were shut does not necessarily mean the juror was asleep. We cannot presume that any prejudice occurred, especially where the record does not demonstrate that a juror fell asleep.

{¶42} The allegation that a juror fell asleep was only raised for the first time in Miller's motion for a new trial, not at the time it allegedly occurred. At trial, no one noted the possibility that a juror might be asleep and we do not presume that Miller was in any way prejudiced.

{¶43} Regarding the juror's question, the record shows that a juror did ask a question during trial regarding the charges against Miller.[4] Asking a question was not misconduct where the juror simply inquired if the jury could be refreshed on the charges against Miller. The trial court reminded the jury that it would receive instructions on the charges before deliberation. The jury did, in fact, receive such instructions that clearly addressed each of the charges against Miller. Thus, the juror's question did not impact the trial's result nor was there any prejudice to Miller in any manner.[5]

## C. Prosecutorial Misconduct

{¶44} Miller asserted that he was entitled to a new trial because the prosecutor

---

4. The juror's question was as follows: "Since we're sittin' in a pause right now, would you mind restating the charges against the defendant? Just to remind us, as we listen to the testimony today?"

5. Although Miller argues that the juror's question demonstrates that juror's incompetence, no such incompetence is demonstrated in the record. The simple fact that the juror asked to be reminded of the charges did not render that juror unable to understand the charges as explained or unable to execute the juror's duties during the trial or deliberations.

committed misconduct. In order to demonstrate prosecutorial misconduct, a defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights. *State v. Harner*, 12th Dist. Clinton No. CA2019-05-011, 2020-Ohio-1184, ¶ 29. "To demonstrate prejudice, a defendant must show that the improper acts were so prejudicial that the outcome of the trial would clearly have been different had those improper acts not occurred." *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 42.

{¶45} "The focus of an inquiry into allegations of prosecutorial misconduct is upon the fairness of the trial, not upon the culpability of the prosecutor." *State v. Combs*, 12th Dist. Clermont No. CA2020-01-004, 2020-Ohio-5397, ¶ 18. Prosecutorial misconduct is not grounds for error unless the defendant has been denied a fair trial because the accused is guaranteed a fair trial, not a perfect one. *State v. Kaaz*, 12th Dist. Clinton No. CA2016-05-010, 2017-Ohio-5669, ¶ 102.

{¶46} First, Miller asserts that the prosecutor essentially lied to Sara when the prosecutor allegedly told Sara that the state was not pursuing a firearm specification. However, what the prosecutor did or did not tell the alleged victim regarding what charges or specifications would be brought lacks pertinence to what occurred at trial and whether Miller was denied a fair trial. The state was free to charge Miller with the crimes and specifications that emerged from Miller's conduct. Any alleged representation to Sara after the incident had occurred had no impact on the evidence presented at trial.

{¶47} Moreover, regardless of what the state may have told Sara, there is no indication in the record that Miller was improperly charged with a firearm specification. Furthermore, Miller examined and cross-examined Sara at length regarding the firearm, and the jury was free to gauge the credibility of her testimony regarding the firearm. This is true regardless of any conversations regarding the firearm specification that may have

occurred before trial.

{¶48} Next, Miller alleged prosecutorial misconduct because the state, during closing arguments, relied upon a photograph of the firearm located next to the table where Miller had at one time hidden during the standoff. Miller argues that the firearm was not at the ready because when he finally left the house, he did so through the attic and the firearm was not near him at the time.

{¶49} However, based on the evidence and testimony presented, including Miller's own admission to police after the standoff ended, Miller was in control of the firearm at various times throughout the time that Sara and the child were in the house and during the standoff. Where the firearm was located at the exact moment of Miller's exit from the house does not change the fact of his possession and control at other times when the child was present in the house.

{¶50} Miller also alleged prosecutorial misconduct because the prosecutor stated during closing arguments that officers pointed weapons toward Sara and the child when they exited the house, thus endangering the child, when no such evidence had been offered at trial. However, the trial court specifically instructed the jury that the statements from the attorneys was not evidence. We presume that the jury followed the instructions from the trial court, unless it is demonstrated otherwise. *State v. Tucker*, 12th Dist. Butler No. CA2017-12-172, 2019-Ohio-911, ¶ 38.

{¶51} The state presented evidence that the child was endangered at times other than when she exited the house. The jury had ample evidence upon which to base its verdict, and there is no indication in the record that Miller would have been acquitted of child endangering absent the prosecutor's statement in closing. The prosecutor argued what she thought evidence showed and a misstatement in closing argument does not necessarily rise to the level of prosecutorial misconduct. *State v. McKelton*, 148 Ohio St.3d 261, 2016-

Ohio-5735, ¶ 272.

## D. Evidentiary Issues

{¶52} Miller also alleged that a new trial was required because of errors made by the trial court when ruling upon several evidentiary matters. "As we previously noted, trial courts have broad discretion in the admission of evidence." *State v. Kincer*, 12th Dist. Clermont No. CA2004-06-048, 2005-Ohio-5626, ¶ 39. This court will not disturb the decision of the trial court absent an abuse of discretion and a showing that defendant has been materially prejudiced. *Id.*

{¶53} First, Miller argues the state did not provide the defense with certain evidence during discovery that the trial court should have required the state to produce. Miller argues that he was denied a fair trial because the state failed to produce a copy of a recorded phone call that occurred between a detective and Sara after Miller was arrested. However, Miller did not establish that the phone call occurred or that it was recorded. We note that Miller had the opportunity to challenge Sara and the detective about the alleged phone call because they appeared at trial as witnesses and Miller was able to cross-examine them regarding any phone calls that occurred.

{¶54} Miller also argued that he was entitled to a new trial because the landlord was permitted to present evidence at trial regarding the damage caused to the rental house. As addressed in our previous discussion of Miller's first and second assignments of error, the trial court properly allowed evidence related to the damage caused to the rental house in support of the calculation for economic harm. The state was entitled to present evidence of law enforcement's efforts to force Miller out of the house.

{¶55} Miller also alleges he is entitled to a new trial because the trial court denied his request to admit certain exhibits into evidence. However, the record indicates that the materials constituted hearsay and were used only for impeachment purposes, not as

substantive evidence.  Nor was the admission of the transcript of an interview with Sara necessary where the actual recording was published to the jury.  The transcript need not have been given to the jury where such would have been cumulative evidence.  *State v. Bai,* 12th Dist. Butler No. CA2010-05-116, 2011-Ohio-2206.  The trial court did not abuse its discretion in these evidentiary matters and a new trial was not warranted.

### E.  Challenges to the Convictions

{¶56}  Miller also argued that his convictions were not supported by the evidence. However, and as addressed above, we have already determined that Miller's convictions were supported by the manifest weight of the evidence and by sufficient evidence.  As such, Miller's motion for a new trial on these grounds was properly denied.

{¶57}  After reviewing the record, including each of Miller's arguments raised in his motion for a new trial, we find that the trial court did not abuse its discretion in denying Miller's motion for a new trial.[6]  Miller's third assignment of error is thus overruled.

{¶58}  Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.

---

6. We have considered each of Miller's arguments within his Motion for a New Trial, and for efficiency sake, have attempted to group his arguments for ease of discussion.  However, the absence of an isolated discussion does not indicate our failure to consider the argument.